W. C. BIGGERS & CO. v. FARMERS' & MERCHANTS' NAT. BANK OF KAUFMAN et al.

No. 3839.

Court of Civil Appeals of Texas. Texarkana. June 10, 1930.

Rehearing Denied July 10, 1930.

See also (Civ. App.) 16 S.W.(2d) 324, 325.

Smithdeal, Shook, Spence & Bowyer, of Dallas, and Tom Whipple, of Waxahachie, for appellant.

Thos. R. Bond, of Terrell, and Angus G. Wynne and Nestor Morrow, both of Kaufman, for appellees.

LEVY, J. (after stating the case as above). ██ It is the insistence of the appellant that (1) the findings of the jury were contrary to the evidence, and (2) the evidence required an instructed verdict in its favor. We are of the opinion that it is more nearly correct to say the evidence shows that (1) the bank and its cashier did know "that A. L. Nash was not authorized to receive cashier's checks from the bank for drafts accepted by him for cotton purchased for the defendant," and (2) "executing and passing the acceptances in question and receiving therefor cashier's checks in payment" was not "the usual and customary way of handling such transactions between the parties thereto." The findings are of vital importance, for it is very evident that if the cashier's checks in favor of the First National Bank of Kemp had not been issued and delivered the present loss would not have been occasioned. In that view of the facts we conclude that the findings of the jury are against the preponderance of the evidence and against the weight of the evidence. The evidence shows without dispute that W. C. Biggers & Co. authorized A. L. Nash (1) to buy cotton generally from "anybody that had cotton for sale" in Kaufman and other points, including Kemp, and (2) to execute and deliver in payment for the cotton so purchased, not checks or cashier's checks, but "trade ac-

ceptances with cotton tickets or their equivalents attached." He was not authorized to receive the proceeds of the acceptances in money or cashier's checks. By this special method and way of paying for the cotton purchased, A. L. Nash, as proven, would have the seller of the cotton sign a draft on W. C. Biggers & Co. through the appellee bank for the purchase price of the cotton and attach thereto the cotton tickets, and then A. L. Nash would sign the draft "accepted" and deliver it to the seller. The appellee bank would then, upon presentation of the acceptance, pay to the seller or his transferee or assignee the amount thereof, and after doing so would charge the amount paid to W. C. Biggers & Co. in its account at the bank. The bank and its cashier actually knew, as appears without dispute, of the authority and the extent of the authority so conferred upon A. L. Nash. As was shown, W. C. Biggers & Co. had specially arranged with and authorized the Farmers' & Merchants' National Bank of Kaufman to pay the money for the cotton purchased by A. L. Nash, not to A. L. Nash, but to the payee named in the "trade acceptances with the cotton tickets or their equivalents attached to the acceptances" so given by the seller and accepted by A. L. Nash. It was in keeping, as appeared, with this arrangement so made with the bank by W. C. Biggers & Co. to pay the amount of the draft signed by the seller and accepted by A. L. Nash, that the form of the acceptances to be used by the parties was prepared. The cashier testified: "The bank prepared the forms and delivered them to A. L. Nash to be used for these acceptances. * * * The bank had these forms printed at its own expense and gave them to A. L. Nash, agent for W. C. Biggers & Co. That form has a line at the bottom, in the right-hand corner, under which is printed the word 'seller.' The usual way of filling out one of the acceptances was for the seller to sign it and to state the number of bales of cotton for which a bill of lading or cotton tickets were attached." The cashier further testified: "I understood that the usual and customary way of handling the business of W. C. Biggers & Co. through A. L. Nash was to have the seller sign the draft. The usual and customary way, when I paid a draft signed by the seller of the cotton, was to give the money to the seller of the cotton." All of the previous acceptances which the appellee bank had signed as "seller" of the cotton, with itself as the payee of the amount, were based on drafts that had "come in from other banks" with the genuine cotton tickets attached. As explained by the cashier: "During all these years that A. L. Nash had been handling their business, in the cases where he would buy cotton at Kemp or Maybank and send them to our bank for payment, they would be handled by draft—whoever he bought the cotton from would draw a draft on

us to W. C. Biggers & Co. A. L. Nash would then come in the bank and take up that draft with an acceptance. After we had advanced the money to pay for this cotton and he gave us an acceptance, the bank, to complete the transaction and as an accommodation to him, would sign for him 'F. & M. Bank, Seller.' That would be done after we had advanced the money to pay for the cotton. The bank had been doing that for five or six years."

In such circumstances, in legal effect, the bank at the time of signing these 66 acceptances as "seller" was, as against W. C. Biggers & Co., in the relationship of the cotton of lienor, and was entitled to the rights and remedies incident to that relationship. The bank had a claim against and an interest in the cotton, created as an incident of advancing the money on the cotton to the seller or his transferee. Such circumstances are not similar to those respecting the four acceptances in suit, and the cashier could and should be held to have reasonably so known. In each of those instances the money was paid directly to the banks forwarding the drafts upon direction of the seller. In the precise facts of the four acceptances in suit A. L. Nash, through means of false statements, had the cashier to execute for the bank the drafts payable to the bank's order and signed by the bank as "seller" and to attach to the drafts cotton tickets which in fact were worthless. He had the cashier to execute and deliver to him cashier's checks payable to the order of the First National Bank of Kemp. But the acts of the certain kind stated were never done before and were not acts contemplated by W. C. Biggers & Co. to be done. That appearance of authority on the part of A. L. Nash was not caused by W. C. Biggers & Co., but by A. L. Nash himself. Executing the acceptances and issuing cashier's checks, as was done, were acts unlike other acts in the usual and customary course of business dealings, and were known to be so by the cashier. As testified by the cashier: "Out of all the drafts handled for that season, as represented by the stubs in the book you are now showing me, on no other occasion was a cashier's check made payable to the First National Bank at Kemp. Well, it might be that it was a little unusual, a little out of the ordinary, to handle it that way. I relied upon what A. L. Nash said to me. I had implicit confidence in him."

Quoting from Gunter v. Robinson (Tex. Civ. App.) 112 S. W. 134, 135: "It does not follow as a matter of course that an agent, employed to negotiate, make, or conclude a contract, has incidental authority to receive payments which may become due under such contract."

In view of the evidence, responsibility for their agent's fraud as to three of the acceptances in suit cannot be imputed to W. C.

Biggers & Co., since the bank through its cashier knew that A. L. Nash was not authorized by W. C. Biggers & Co. to have issued and to receive the cashier's checks on the Kemp bank. It is believed, however, that the peremptory instruction was not required by the evidence, considered in its entirety, because there was evidence going to show that W. C. Biggers & Co. derived some benefit from the first acceptance in receiving credit therefor at the First National Bank. In this record this latter issue was the issue—and the only issue, we think—that should have been tried before the jury. Accordingly the judgment is reversed and the cause remanded.

### On Motion for a Rehearing.

If the evidence should be the same on the next trial of the case as was shown on this appeal respecting the cause of action on the three drafts Nos. 419, 422, and 423, then as respects such drafts a verdict should be directed in favor of the appellant. The issue arising for decision by the jury would be respecting the cause of action on draft No. 416, unless other evidence that might be offered in the trial would warrant a different holding in respect to such draft. With this explanation the motions of both the appellant and the appellee for a rehearing are overruled.